# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 22, 2020　　　　　Decided July 21, 2020

No. 18-1337

INDEPENDENT PRODUCERS GROUP,
APPELLANT

v.

COPYRIGHT ROYALTY BOARD AND LIBRARIAN OF CONGRESS,
APPELLEES

AMAZING FACTS, INC., ET AL.,
INTERVENORS

---

Consolidated with 19-1116

---

On Appeals from the Copyright Royalty Judges

---

*Brian D. Boydston* argued the cause and filed the briefs for appellant.

*Martin V. Totaro*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Daniel Tenny*, Attorney. *Mark R. Freeman*, Attorney, entered an appearance.

*Matthew J. MacLean*, *Jessica T. Nyman*, *Michael A. Warley*, *Gregory O. Olaniran*, *Lucy Holmes Plovnick*, *Daniel A. Cantor*, *R. Stanton Jones*, *Michael Kientzle*, *Philip R. Hochberg*, and *Jeremy W. Dutra* were on the brief for intervenors in support of appellees.

Before: GRIFFITH and PILLARD, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Under the Copyright Act, when a cable or satellite company retransmits programs initially aired on broadcast stations, the Register of Copyrights collects royalty fees under a compulsory licensing scheme and later redistributes the fees to the appropriate copyright owners. The Copyright Royalty Judges (the Judges) preside over royalty distribution proceedings and settle disputes among royalty fee claimants. Appellant Worldwide Subsidy Group LLC dba Independent Producers Group (IPG), an agent for royalty claimants in these proceedings, challenges a series of decisions by the Copyright Royalty Judges denying most of its clients' royalty fee claims for programming in the devotional and program suppliers' categories that was retransmitted by cable for 2004-2009 and by satellite for 1999-2009. IPG lost the right to pursue many of its clients' claims as a result of a discovery sanction and because, after the Judges held that IPG was not entitled to a "presumption of validity" for either its representative role or the validity of the royalty claims it proffered, IPG failed to establish for certain claims that it was a duly appointed agent pressing valid claims. IPG challenges the factual grounds for those determinations and contends they are so disproportionately harsh as to be an abuse of discretion. It also challenges as arbitrary the Judges' final distribution

methodologies for allocating the royalties to all eligible claimants.

We affirm the Copyright Royalty Judges on all three challenges: the revocation of the presumption of validity, the imposition of discovery sanctions, and the final distribution of royalties.

## I.   Background

### A.   Statutory Structure

Congress has prescribed a centralized clearinghouse system for collecting royalty fees from anyone who retransmits a copyrighted television program and for distributing the fees to the program's copyright holder.  The Copyright Act allows cable and satellite operators to retransmit copyrighted programs without permission, requiring only that the operators deposit a statutorily prescribed royalty fee with the Register of Copyrights every six months for programs retransmitted during that period.  *See* 17 U.S.C. § 111(c), (d) (cable); *id.* § 119(a), (b) (satellite).  The Copyright Royalty Judges annually decide how to distribute the resulting pool of funds to the relevant copyright holders.  *Id.* § 801(b)(3).

Every July, copyright owners (or their agents) who assert entitlement to certain royalties for transmission of their programming during the preceding year file claims with the Judges.  *Id.* § 111(d)(4)(A); 37 C.F.R. § 360.3.  Each filing entity must certify that it is authorized to file the claim.  *See* U.S. Copyright Royalty Judges, *In re Distribution of 2004, 2005, 2006, 2007, 2008, & 2009 Cable Royalty Funds*, *In re Distribution of 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, & 2009 Satellite Royalty Funds*, Nos. 2012-6 CRB CD 2004-09 (Phase II); 2012-7 CRB SD 1999-2009

(Phase II), Memorandum Opinion and Ruling on Validity and Categorization of Claims 5 (Mar. 13, 2015) (Claims Ruling). Absent any challenge to that certification, the Judges afford the filed claim a "presumption of validity," meaning they treat the claim as facially valid and the filer as duly authorized. *Id.* The Judges review these claims and "determine whether there exists a controversy concerning the distribution of royalty fees." 17 U.S.C. § 111(d)(4)(B). If there are no disputed claims, the Judges authorize the Librarian of Congress to distribute the fees to the claimants on a proportional basis. *Id.* Only if there is a controversy must the Judges conduct a proceeding to resolve disputes regarding the appropriate distribution. *Id.*

A copyright royalty distribution proceeding has two phases. During Phase I, the claimants group themselves into categories based on the type of retransmitted broadcasting. *See* 37 C.F.R. § 351.1(b)(2)(i)(B); *id.* § 351.1(b)(ii)(C). The two categories relevant here are "program suppliers" and "devotional" programming. Claims Ruling at 1. The Judges then calculate the total market value of all programming in each category during the relevant year and, based on its relative value, assign each category a percentage of the annual pool of royalty fees. *See id.* § 351.1(b)(2)(i)(B). During Phase II, at issue here, the Judges subdivide the fees due to a particular category among the individual claimants in that category. *Id.*

Each phase follows the same set of procedures, designed to promote expeditious and amicable resolution among the claimants. After the Judges announce the commencement of distribution proceedings in the Federal Register, 17 U.S.C. § 803(b)(1)(A)(i), claimants petition to participate, *see id.* § 803(b)(1). A claimant may file an individual petition or join with other claimants and share representation. 37 C.F.R. § 351.1(b)(2). The Act imposes a three-month "voluntary negotiation period" during which participating claimants must

attempt to reach agreement on their relative shares.  17 U.S.C. § 803(b)(3).

As to disputes the claimants are unable to resolve through negotiation, the Judges accept written submissions, oversee a period for discovery, and order a post-discovery settlement period. *See id.* § 803(b)(6)(C); 37 C.F.R. §§ 351.4-351.7.  For Phase I, discovery usually involves expert testimony categorizing programs and their market shares.  For Phase II, discovery involves both proof that individual claimants in fact represent the copyright holders and expert testimony proposing methodologies for subdividing fees among claimants in specific program categories.    After the post-discovery settlement period, the Judges hear any remaining disputes and issue final determinations on the merits.  *See* 17 U.S.C. § 803(c)(1); 37 C.F.R. §§ 351.8-351.12.  The Librarian of Congress publishes those determinations in the Federal Register and distributes the royalty fees accordingly.  17 U.S.C. § 803(c)(6).

### B.   Procedural History

As noted at the outset, at issue here are royalty fees for retransmission of programming in the devotional and program suppliers categories by cable providers during 2004-2009 and by satellite providers during 1999-2009.  There are three repeat players who claim to represent the copyright holders of programs retransmitted via both cable and satellite in these categories:  Appellant IPG, claiming royalties for programs in both categories; Intervenors Settling Devotional Claimants (SDC), claiming only for devotional programming; and

Intervenors Motion Picture Association (MPA),[1] claiming only in the program suppliers category.

### 1. The claims validity hearings

IPG, the SDC, and MPA did not participate in the Phase I proceedings but successfully petitioned to participate in Phase II. *See* 78 Fed. Reg. 50,113, 50,114 (Aug. 16, 2013) (cable retransmissions); 78 Fed. Reg. 50,114, 50,115 (Aug. 16, 2013) (satellite retransmissions). On December 8, 2014, the Copyright Royalty Judges held a five-day evidentiary hearing to resolve disputes over the validity and categorization of claims. They heard live testimony from five witnesses and admitted 180 exhibits.

### a. Presumption of validity

The SDC argued that IPG should be disqualified from participating, or at least denied the presumption of validity, because one of the claims advanced by IPG was a fraudulent one on behalf of "Tracee Productions," a fictitious entity. IPG had purported to represent Tracee Productions in an earlier proceeding and the Copyright Royalty Judges denied IPG's proffered claims the presumption of validity. In response to the fraudulent Tracee Productions claim in the proceeding at issue here, the Judges stopped short of debarring IPG from representing claimants, instead again denying a presumption of validity to IPG's certification of its authority to represent claimants. The Judges based that decision on two grounds: IPG's failure to purge its filing of false claims and the Judges'

---

[1] The Motion Picture Association was formerly the "Motion Picture Association of America," or MPAA. The Judges and other parties commonly refer to it this way, although the correct term now seems to be "MPA." *See* Intervenors' Br. i.

*sua sponte* conclusion that Raul Galaz, IPG's principal witness, gave false testimony concerning a document IPG produced in discovery.

The fraudulent "Tracee Productions" claim has a history in which Galaz played a prominent role. Galaz in 2002 was criminally convicted of defrauding the Copyright Office in order to obtain cable retransmission royalties belonging to others, and among the criminal acts to which he admitted was fraudulent filing in several proceedings on behalf of the nonexistent "Tracee Productions." *See* U.S. Copyright Royalty Judges, *In re Distribution of 1998 and 1999 Cable Royalty Funds*, No. 2008-1 CRB CD 98-99 (Phase II), Ruling and Order Regarding Claims 3 (June 18, 2014) (2014 Claims Ruling); Judgment and Commitment, *United States v. Galaz*, No. 02-cr-230 (HHK) (D.D.C. Dec. 23, 2002). Before that fraud came to light, Galaz had filed a fraudulent claim on behalf of Tracee Productions as part of his claims to the 1999 cable royalty funds for devotional programming. 2014 Claims Ruling at 3. The fraudulent 1999 filing was not part of his criminal conviction but, by the time the Phase II proceedings for the 1998 and 1999 cable royalty funds for devotional programming commenced in 2008, the facts surrounding Galaz's conviction were available to the Copyright Royalty Judges and IPG had not withdrawn the fraudulent Tracee Productions filing. The Judges therefore denied IPG the presumption of validity in the 1998 and 1999 proceedings because of its failure to withdraw its 1999 fraudulent Tracee Productions claim before or during those proceedings. *Id.* at 5-11. In the instant proceedings, the Judges found especially troubling IPG's proffer of a Tracee Productions claim in its 1999 satellite retransmission filing because the 1998 and 1999 proceedings put it on notice that it must purge Tracee Productions from its claim submissions.

The Judges' second ground for denying the presumption of validity was Galaz's false testimony about IPG's 2008 satellite claims filing. IPG filed separate lists of claims for satellite retransmissions and cable retransmissions. It argued that both lists of claims were identical. But while IPG produced in discovery a copy of its cable claim with consecutive numbers of 1 to 10, it produced a copy of its satellite claim that appeared incomplete, as indicated by pages numbered 1 to 3 and 6 to 8. Noting the missing pages, MPA and the SDC had moved to dismiss the claims of the 39 claimants listed on the cable claims filing but not included in the satellite claims filing. When questioned at the claims hearing, Galaz sought to blame the Copyright Royalty Board (CRB or the Board)[2] for the missing pages. He testified that he personally had gone to the Board's records office to obtain a copy of the claims filing and received from the Board in its incomplete condition the version that IPG produced in discovery. *See* Claims Hrg. Tr. vol. 2, 104:18-105:16. Galaz testified that he was "certain" IPG had originally filed a complete version with the Board, and that it was the Board that had lost the missing pages after IPG filed its claims but before Galaz retrieved the copy from the Board that (Galaz testified) IPG then produced in discovery in the Phase II proceeding. *Id.* vol. 5, 201:8.

The Judges concluded that Galaz testified falsely because the evidence showed that the incomplete copy he claimed to have received from the Board and that IPG submitted in discovery could not in fact have come from the Board. The Copyright Royalty Board inscribes a sequential number on the first page of any received claims filing. MPA obtained a

---

[2] The Copyright Royalty Board is the institutional entity in the Library of Congress that houses the Copyright Royalty Judges and their staff. 37 C.F.R. § 301.1.

certified copy of the claims filing from the Board and produced it in discovery. The copy submitted by IPG in discovery and the certified copy obtained by MPA from the Board, both lacking pages 4 and 5, differed in only one respect: MPA's Board-certified copy contained a handwritten "193" on the first page, whereas the copy IPG produced did not. Claims Ruling at 8. The Judges therefore concluded that Galaz could not have received the incomplete version submitted by IPG from the Board's files, because a true copy would have included the Board's handwritten number, as shown by the certified copy obtained by MPA. Instead, the Judges concluded, Galaz must have received it elsewhere, "most likely IPG's own records." *Id*. On that basis, the Judges concluded that IPG had failed to submit claims on which it later sought to recover, and that Galaz testified falsely to the contrary.

IPG filed a motion for modification to contest the Judges' conclusion that Galaz gave false testimony by submitting Copyright Royalty Board records that contained certain irregularities. The Judges rejected the motion, noting that IPG's new evidence showed that the Board placed numbers on each of 237 satellite claim filings from 2008, so did "nothing more than prove the point: the CRB numbers every claim that it accepts for filing." U.S. Copyright Royalty Judges, *In re Distribution of 2004, 2005, 2006, 2007, 2008, & 2009 Cable Royalty Funds*, *In re Distribution of 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, & 2009 Satellite Royalty Funds*, Nos. 2012-6 CRB CD 2004-09 (Phase II); 2012-7 CRB SD 1999-2009 (Phase II), Order on IPG Motions for Modification 2 (Apr. 9, 2015) (Modification Ruling I).

### b. Discovery sanction

The SDC also argued that IPG's royalty claims on behalf of Creflo Dollar Ministries (Creflo Dollar), Benny Hinn

Ministries (Benny Hinn), and Eagle Mountain International Church, dba Kenneth Copeland Ministries (Eagle Mountain), should be struck as a discovery sanction for IPG's failure to produce to the SDC a particular email responsive to an SDC discovery request. The SDC sought correspondence between IPG and devotional programming claimants relating to representation agreements. The withheld 2005 email, from a lawyer named David Joe to an IPG representative, concerns representation agreements between Joe's "clients" and IPG. E-mail from David R. Joe, Brewer Anthony & Middlebrook PC, to Annie Lutzker, *et al.* (Nov. 23, 2005) (J.A. 2037).

The parties dispute whether Joe is in fact an agent of any relevant "clients," but whether or not these producers are accurately described as Joe's "clients," this email appears to refer to agreements between IPG and Benny Hinn, Creflo Dollar, and Eagle Mountain. In the email itself Joe described the "matter at hand" as "the 1999 cable distribution," and identified the agreements that were "the subject of this discussion" as "the sole agreement with Hinn and Creflo, and the second of two agreements with Copeland." *Id.* Joe wrote that "I could easily support the position that these agreements are not in effect because they have been breached, if you think they have not been unequivocally terminated," and noted that any plan on IPG's part to represent these clients at the distribution proceeding "needs to be put to rest immediately, and after it is, you should, in all candor, expect that the termination provisions will be invoked." *Id.*

The SDC claimed that the email was responsive to its discovery request. The Judges agreed, finding that IPG had failed to produce discovery "relating to claimants' attempted termination(s) of IPG's agency," and disallowed IPG's claims on behalf of the mentioned claimants, Creflo, Benny Hinn, and Eagle Mountain. Claims Ruling at 39. In contrast to the denial

of the presumption of validity, which was not a sanction but a refusal to afford IPG a presumption that its conduct suggested it did not deserve, the Judges dismissed these claims as a sanction for IPG's discovery violation.

IPG twice moved to modify the discovery sanction, arguing that the email was irrelevant and the sanction too harsh. The Judges twice denied IPG's motions, bolstering their decision by identifying additional discovery requests to which the email was responsive, yet was never produced.

### 2. *Distribution methodologies hearings*

From April 13 to 17, 2015, the Judges held another hearing in which they received evidence and expert testimony regarding appropriate distribution methodologies for the royalties in the program suppliers and devotional programming categories. MPA offered a methodology for computing relative royalty shares in the program suppliers category, the SDC offered one for the devotional programming category, and IPG submitted a methodology that it contended should be used for both categories. The Judges faulted MPA and the SDC's methodologies as supported by insufficient data, and faulted IPG's methodology for "its reliance on volume, time of day, fees paid and number of subscribers as measurements of value" U.S. Copyright Royalty Judges, *In re Distribution of 2004, 2005, 2006, 2007, 2008, & 2009 Cable Royalty Funds*, *In re Distribution of 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, & 2009 Satellite Royalty Funds*, Nos. 2012-6 CRB CD 2004-09 (Phase II); 2012-7 CRB SD 1999-2009 (Phase II), Order Reopening Record and Scheduling Further Proceedings 6 (May 4, 2016) (Order Reopening Record). The Judges declined to adopt any of the offered methodologies and directed that the record be reopened. *Id.* at 8. The Judges "set aside" all submissions, evidence, and testimony from the April

2015 hearing and ordered the parties to submit new evidence for a new hearing. *Id.*

On motion from MPA and the SDC, the Judges excluded all of IPG's evidence from the new hearing for two reasons: First, IPG asserted without explanation that its sole witness, economic expert Dr. Cowan, could not appear at the hearing and so would not be subject to cross-examination. Second, the Judges' rules require that a party wishing to rely on the testimony of a witness from a prior proceeding must designate the complete testimony of that witness and include a copy of it, 37 C.F.R. § 351.4(b)(2), but IPG failed to do so. IPG's only evidence aside from Dr. Cowan's written testimony consisted of citations to testimony from witnesses in past distribution proceedings. IPG failed to include transcripts of the designated testimony, in violation of the Judges' rules. *See* Final Distribution Determination: Distribution of 2004, 2005, 2006, 2007, 2008, and 2009 Cable Royalty Funds; Distribution of 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, and 2009 Satellite Royalty Funds, 84 Fed. Reg. 16,038, 16,040 (Apr. 17, 2019) (Final Distribution Determination). The Judges nevertheless allowed IPG to use Dr. Cowan's written testimony and IPG's other exhibits in cross-examining MPA and the SDC's witnesses. *Id.* The Judges denied MPA and the SDC's motion for summary disposition, instead conducting a hearing with live testimony to afford IPG the opportunity to cross-examine the witnesses. *Id.*

Following the new hearing in the reopened proceeding, the Judges concluded that MPA and the SDC had fixed the paucity of data identified in the earlier hearing. *Id.* at 16,043, 16,046. The Judges adopted MPA's methodology and proposed percentages for the program suppliers category, *id.* at 16,045, and adopted the SDC's for the devotional category, *id.* at 16,048.

**II. Analysis**

**A. Standard of Review**

We review decisions of the Copyright Royalty Judges to determine whether they are arbitrary, capricious, contrary to law or unsupported by substantial evidence. *See* 17 U.S.C. § 803(d)(3) (incorporating by reference 5 U.S.C. § 706). "Our review is 'highly deferential.'" *Settling Devotional Claimants v. CRB*, 797 F.3d 1106, 1114 (D.C. Cir. 2015) (quoting *Intercollegiate Broad. Sys., Inc. v. CRB*, 571 F.3d 69, 79 (D.C. Cir. 2009)). Objections to the Judges' procedural and evidentiary orders "merge[] into and [are] reviewable" as part of the final determination. *Id.*. We review the Judges' determinations that a claimant violated its discovery obligations "with 'extreme deference' because the 'conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance.'" *Indep. Producers Grp. v. Librarian of Cong.*, 792 F.3d 132, 138-39 (D.C. Cir. 2015) (quoting *Hi-Tech Furnace Sys., Inc. v. FCC*, 224 F.3d 781, 789 (D.C. Cir. 2000)). When reviewing royalty distribution decisions, including distribution methodologies, "we ask only whether the Royalty Judges' assigned allocation percentages are 'within a zone of reasonableness.'" *Settling Devotional Claimants*, 797 F.3d at 1114 (quoting *Christian Broad. Network, Inc. v. Copyright Royalty Tribunal*, 720 F.2d 1295, 1304 (D.C. Cir. 1983)).

**B. Presumption of Validity**

IPG does not question the Judges' authority to determine when the presumption of validity applies, but challenges their withholding of the presumption here as an abuse of discretion for want of substantial evidence that Galaz lied. IPG further contends that it received constitutionally inadequate process to

contest the denial of the presumption that it was an authorized representative pressing valid claims. Neither of these arguments has merit.

IPG produced evidence that the Copyright Royalty Board sometimes makes mistakes, but nothing called into question the evidence that the Board numbered every satellite filing it received for 2008, the IPG filing on record with the Board contained such numbering, and the version IPG produced did not. IPG identifies a handful of instances in which the Board lost an entire filing or failed to number one, and it is certainly "*not inconceivable* over the course of six years for the [Board] to have misplaced a handful of pages from a single claim filed by IPG." Appellant's Br. 46 (emphasis added). But the mismatch between the claims number on the Board's certified copy of IPG's claims and that number's absence on the copy produced by IPG is substantial evidence of the falsity of Galaz's testimony that IPG originally filed a complete copy, and only received the incomplete copy in discovery from the Board.

The Judges' decision to deny IPG the presumption of validity based on Galaz's false testimony and the fraudulent Tracee Productions claim was not so severe as to be an abuse of discretion. The presumption allows efficient distribution of royalties; without it, the Judges would have to verify agent-client relationships and make copyright-ownership determinations for each filer seeking copyright royalties. When they are able to rely on the presumption, the Judges need only resolve the particular disputes, if any, that parties may raise concerning the distribution of royalty fees. The relative efficiency of such a system requires the good faith of its participants but is seriously threatened by fraud or other abuse of the presumption. The system accommodates the Judges' excuse of good-faith mistakes, but it certainly does not require

the Judges to treat every irregularity as a good-faith error. The Judges' denial of the presumption to claims pressed by claimants who appear not to have acted in good faith and, in the absence of evidence supporting claims bereft of the presumption, their grant of royalties only to unquestioned claims and claimants is reasonable and non-arbitrary.

The only effect on IPG of the Judges' setting aside the presumption was to place a burden on IPG to establish its authority to represent the copyright holders on whose behalf it claimed royalties. "To maintain the viability of this claims distribution process, to preserve the reliability of the information presented to the Judges and to prevent the abuse of asymmetric information by participants, the elimination of the presumption of *prima facie* validity as to the claims IPG purports to represent constitutes a measured and proper response." 2014 Claims Ruling at 11. Indeed, the Judges' response was mild in view of IPG's repeat filing of fraudulent claims for a "client" previously found to be fictional and Galaz's obfuscatory testimony about IPG's faulty filing. IPG's loss of a large number of claims is no draconian sanction but rather the predictable and reasonable result of IPG's failure to document its authority to represent the copyright holders, its failure to file a complete set of claims on their behalf, and Galaz's attempt to cover up the latter failure by blaming the Board.

There is no question here that the process IPG received was constitutionally adequate. IPG received notice that the presumption might be denied from both the MPA and the SDC's written submissions requesting that relief. IPG had the opportunity at a hearing to testify and present evidence in support of its position. The Judges further considered IPG's position as urged in its motion for modification. IPG had all

the process it was due.  *See Indep. Producers Grp.*, 792 F.3d at 139 n.5.

### C.   Discovery Sanction

IPG argues that its failure to produce the David Joe email was not a violation of any discovery obligation and that, even if it were, the sanction of dismissing the claims of the three producers IPG purported to represent was an abuse of discretion.  It also argues that the Judges could not, consistent with due process principles, impose anything other than a monetary sanction without prior notice to IPG and a finding of prejudice to the SDC.  We hold that the sanction, while harsh, was not arbitrary and capricious and did not violate due process.

Because the Copyright Royalty Judges are closer to the facts at hand and better able to determine what may or may not fall within the scope of discovery, we review their determinations that a claimant has violated its discovery obligations with "extreme deference."  *Indep. Producers Grp.*, 792 F.3d at 142 (quoting *Hi-Tech Furnace Sys.*, 224 F.3d at 789).  Even viewing their ruling without such deference, it is plain that the David Joe email is responsive to several of the SDC's discovery requests.  For example, the SDC's Document Request Number Six requested "copies of all correspondence between IPG and Claimants with respect to the Devotional Representation Agreements," U.S. Copyright Royalty Judges, *In re Distribution of 2004, 2005, 2006, 2007, 2008, & 2009 Cable Royalty Funds*, *In re Distribution of 1999-2009 Satellite Royalty Funds*, Nos. 2012-6 CRB CD 2004-09 (Phase II); 2012-7 CRB SD 1999-2009 (Phase II), Settling Devotional Claimants' Written Rebuttal Statement on Claims Issues Only 15-16 & n.4 (Oct. 15, 2014) (SDC Written Rebuttal Statement), and the SDC's Follow-Up Request Number Six requested

documents "relating to termination or attempted termination of IPG by any claimant," Modification Ruling I at 5 n.5. Whether, as IPG contends, the David Joe email itself announced no termination or attempted termination is beside the point; the email is clearly a communication "relating to" IPG's representation agreements and their potential termination. As the Judges noted, the very purpose of requesting all documents "relating to" a disputed issue is that "[t]he producing party does not make a judgment call regarding what evidence might be probative, persuasive, or admissible." *Id.* at 4. IPG's failure to produce a plainly responsive document, even accounting for IPG's own reading of the document as ultimately exculpatory, was a blatant discovery violation.

Whether the imposed sanction was reasonable presents a closer question. We evaluate the choice of sanction under the same standards by which we judge other administrative actions, reversing only if—taking account of the nature of their authority and the context in which they have exercised it— "their decision is arbitrary, capricious, contrary to law, or not based on substantial evidence." *Settling Devotional Claimants*, 797 F.3d at 1114 (citation omitted). It is not for us to determine whether the Copyright Judges' choice was the one we also would have taken. Just as they are equipped to make the factual determination as to whether a discovery violation has occurred, the Judges are better positioned to evaluate the appropriate severity of a sanction in the context of the discovery violation's impact on the participants and the overall proceeding.

IPG submits various inadmissible estimations of the proportion of the royalties to which these three producers might otherwise have been entitled, but the Copyright Royalty Board does not dispute that the dismissal of their claims was a substantial loss to IPG. IPG contends that, under the standard applicable when a district court dismisses a litigant's claims as

a discovery sanction, the Judges' sanction was invalid. In civil litigation in federal court, a sanction of claim dismissal must be justified by "(1) prejudice to the other party, (2) prejudice to the judicial system requiring the district court 'to modify its own docket and operations to accommodate the delay,' [or] (3) the need 'to sanction conduct that is disrespectful to the court and to deter similar conduct in the future.'" *Butera v. District of Columbia*, 235 F.3d 637, 661 (D.C. Cir. 2001) (quoting *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998)); *see also id.* (noting district court authority to sanction pursuant to Federal Rule of Civil Procedure 37(b)(2) and the court's inherent power to protect the integrity of the judicial process).

We do not think that standard is applicable here. The discovery and sanctions regime in federal district courts is materially different from discovery and claim verification in distribution proceedings under the Copyright Act. The Copyright Royalty Judges do not derive their sanctioning power from authorities governing Article III courts; instead, Congress empowered these specialist Judges to supervise disbursement of broadcast royalties. The Act empowers the Judges to "make any necessary procedural or evidentiary rulings" in the royalty proceedings. 17 U.S.C. § 801(c). And their "plenary grant of adjudicative authority" includes power to impose "sanctions when necessary to ensure fairness and maintain [the] integrity" of the copyright claims process. *Indep. Producers Grp.*, 792 F.3d at 138 n.4 (citing *Atl. Richfield Co. v. Dep't of Energy*, 769 F.2d 771, 775, 795-96 (D.C. Cir. 1985)). In contrast to litigation in federal court, the copyright royalties distribution process is largely clerical, designed to enable good-faith participants to recover their royalties through a streamlined, amicable, administrative procedure. The administrative hearings backstop the clerical process, and even they stop short of full adversary trials.

Rather, where disputes arise over submitted royalty claims, the Act provides for a period to further encourage amicable settlement and, failing that, discovery and hearings geared toward expeditious resolution by the Judges. IPG has cited no authority to import discovery-sanction standards designed for adversarial adjudication in federal district court into proceedings crafted by Congress to suit the specific needs of routine royalty disbursement to holders of broadcast copyrights.

The Judges' choice of sanction in this case, while severe, was not unreasonable. IPG withheld an email plainly responsive to SDC discovery requests, and the Judges responded by dismissing the directly implicated claims—those mentioned in the email. The Judges "reasonably responded to a blatant discovery violation by IPG," *Indep. Producers Grp.*, 792 F.3d at 138, and so long as the sanction falls within reasonable parameters, we must affirm even if a lesser sanction might have sufficed to preserve the integrity of distribution proceedings. IPG had notice that the Judges might dismiss its clients' claims because the SDC requested that the claims be struck. IPG then had the opportunity to argue against dismissal at a hearing and in two subsequent motions for modification, which satisfies the requirements of due process.

### D. Distribution methodologies

Finally, IPG objects to the final royalty distribution methodologies selected by the Judges, contending that the Judges had previously rejected those very methodologies for insufficient evidence. It also argues that the exclusion of IPG's expert reports as noncompliant with the Judges' published rules elevated "form over substance" and, because it left IPG's claims fatally unsupported, was an abuse of discretion. Appellant's Br. 70. We hold that the Judges' distribution

methodology decisions were well "within a zone of reasonableness." *Settling Devotional Claimants*, 797 F.3d at 1114 (quotation marks and citation omitted).

First, the Judges were within their discretion in holding that IPG's expert reports failed to conform to the Judges' published regulations in that IPG failed to attach copies of prior testimony that it wished to designate in the new proceeding. *See* 84 Fed. Reg. at 16,040 n.12 (citing 37 C.F.R. § 351.4(b)(2)). The Judges fairly allowed IPG to use the reports in cross-examining the SDC and MPA's experts, but IPG failed to undermine the experts. When the Judges faulted IPG for lacking evidence or expert analysis to rebut the SDC and MPA's experts, they were not automatically ruling against IPG for its want of an expert, but legitimately noting that "[c]riticism by IPG's counsel is not a substitute for expert rebuttal testimony." *Id.* at 16,046.

Second, the Judges reasonably adopted the SDC and MPA's methodologies once they both fixed the evidentiary problems the Judges had initially identified. The Judges must apportion royalties among rightsholders for specific programs in each program-category pool. To do so, they must determine the relative marketplace value of those programs—a calculation highly dependent on viewership. *See Indep. Producers Grp.*, 792 F.3d at 142. For cable and satellite retransmission royalties, the relevant viewership data quantify *distant* viewership, as the royalties are for retransmissions elsewhere of locally aired programs. The Judges initially faulted MPA and the SDC for lacking data showing a correlation between local ratings and distant viewership sufficient to justify quantifying distant viewership as a function of local ratings. *See* Order Reopening Record at 2-5.

MPA's methodology apportioned royalties in the program suppliers category based on the respective number of hours that cable and satellite subscribers viewed MPA-represented and IPG-represented programs. 84 Fed. Reg. at 16,042. Because obtaining distant viewership data for every year was prohibitively expensive, MPA's expert initially used local viewing data from 2000 to 2009 and distant viewing data from 2000 to 2003 to calculate the relationship between them and used that formula to predict distant viewership for the years such data were unavailable. *See* Order Reopening Record at 3. The Judges held that there were too many reasons the relationship between known local and distant viewing data from 2000-2003 would not validly project unknown distant viewership based on known local viewership data for the 2004-2009 period. They found the evidence inadequate without either (1) more contemporaneous data from which to derive a relationship or (2) other evidence that could persuade the Judges such data were not needed for the methodology to be reliable. *Id.* at 4. In the new hearing, MPA supplied distant viewership data from 2008-2009, 84 Fed. Reg. at 16,042, and its expert relied on the new and previously submitted data to explain that the relationship between local and distant data observed from 2000 to 2003 did not change significantly for the period from 2008 to 2009, *see id.* at 16,043. The Judges reasonably held that the additional two years of distant viewing data beyond what was submitted in the initial hearing satisfied their first concern, and the similarity of the relationship rendered reliable the expert's extrapolation regarding the years for which data remained unavailable. *See id.* The Judges reasonably accepted the new evidence as remedying their earlier evidentiary concerns and adopted the methodology.

The Judges had initially faulted the SDC's methodology for similar problems, as its expert, extrapolating from local data from the periods in question, relied on distant viewing data

limited to February 1999 for what the expert claimed was a statistically significant correlation between local and distant viewership. Order Reopening Record at 5. The Judges concluded that the SDC's methodology suffered from a "critical lack of data," both because there was no evidentiary basis to conclude that a correlation "in the 1999 data continues unchanged throughout the entire succeeding decade" and because, even for the local data, the SDC's expert had relied on evidence from a single month in each year from 1999 to 2003. *Id.* As it had with MPA's data, the Judges held the SDC's methodology faulty absent more contemporaneous distant viewing data and more local ratings data, or grounds to conclude such data were not necessary. *Id.*

In the reopened proceeding, the SDC remedied both those evidentiary deficiencies to the Judges' satisfaction. The SDC's expert added distant viewership data from 1999 through 2003 at four different times during in each year. 84 Fed. Reg. at 16,045. And he gathered complete local data for the years 2004 to 2009 and used the data to demonstrate that program ratings from a single month (*i.e.*, February) were representative of ratings throughout the year.

The Judges held that the SDC and MPA's additional data "presented a quantum of persuasive evidence and analysis demonstrating a positive correlation between local ratings and distant viewing *that is consistent over time*." *Id.* at 16,046 (emphasis added). IPG has offered no evidence or argument that calls into question the reasonableness of the Judges' conclusion, other than to raise a broadside objection to any viewership-based methodology in Phase II proceedings—an objection that we have repeatedly rejected. *See, e.g.*, *Settling Devotional Claimants v. CRB*, Nos. 15-1084, 15-1093, 2017 WL 1483329, at *1 (D.C. Cir. Feb. 10, 2017); *Indep. Producers Grp.*, 792 F.3d at 142.

23

* * *

For the foregoing reasons, we affirm the final determination of the Copyright Royalty Judges and the underlying orders challenged on appeal.

*So ordered.*